1

**SAXENA WHITE P.A.**

2

David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com

3

12750 High Bluff Drive
Suite 475

4

San Diego, CA 92130
Telephone:     (858) 997-0860

5

Facsimile:      (858) 369-0096

6

*Counsel for Plaintiff*

7

8

### UNITED STATES DISTRICT COURT

9

### NORTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| CHARLES WILLIAMS, Individually and on Behalf of All Others Similarly Situated, | Case No.: |
| | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| Plaintiff, | |
| vs. | |
| PENUMBRA, INC., ADAM ELSESSER, and GITA BARRY, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Charles Williams ("Plaintiff") alleges the following based upon personal knowledge as to allegations specifically pertaining to Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Penumbra, Inc. ("Penumbra" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants and other parties; (c) review of news articles, shareholder communications, conference calls and postings on Penumbra's website concerning the Company's public statements; and (d) review of other publicly available information concerning the Company.

## NATURE OF THE ACTION

1.      This is a federal securities class action against Penumbra and certain of its officers (collectively, "Defendants") for violations of the federal securities laws.  Plaintiff brings this action on behalf of all persons or entities that purchased or otherwise acquired Penumbra common stock from August 3, 2020 through December 15, 2020, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  The action alleges that Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price in violation of Sections 10(b) and 20(a) of the Exchange Act.

2.      Penumbra is a global healthcare company that develops, manufactures and sells innovative medical devices for patients suffering from stroke and other vascular and neurovascular diseases. Penumbra was the first company to market aspiration catheters, a specialized catheter designed to remove blood clots from arteries and veins in stroke patients, in a surgical procedure known as a thrombectomy.

3.      Until recently, one of the Company's flagship products was the "Jet 7 Xtra Flex," an aspiration catheter designed to be inserted into an affected artery, navigated to a blood clot, and used to suck the clot out of the patient's body.  The Jet 7 Xtra Flex was introduced to the U.S.

market in July 2019 and quickly became a "growth driver" for the Company, a key source of new revenues.

4.     In mid-2020, however, concerns about the Jet 7 Xtra Flex's safety began to emerge. On June 22, 2020, for example, Penumbra's distributor in Japan sent a letter to hospitals warning of issues with the new Jet 7 Xtra Flex, stating that "part of the catheter inflated into a balloon and damaged a patient's blood vessel" when the product was used, causing injury and deaths.  Shortly thereafter, the Company suspended sales of the Jet 7 Xtra Flex in Japan.

5.     Approximately one month after that letter, on July 27, 2020, the Company issued a notice to its U.S. customers and practitioners acknowledging reported instances in which the distal tip of the catheter broke or expanded, carrying a risk of injury or death (the "July 2020 Notification" or "Notification").   The July 2020 Notification warned physicians to exercise caution with the Company's Jet 7 Xtra Flex, and maintained that Penumbra was "committed to product safety and performance" and was "continuing to monitor and investigate these adverse event reports." Despite these adverse reports, Defendants repeatedly assured investors during the Class Period that the Jet 7 Xtra Flex was "absolutely safe" and "not a product that has any possibility of needing to be recalled," as the Company was taking all necessary steps to protect patients.

6.     The Class Period begins on August 3, 2020, when the Company announced its financial results for the second quarter of 2020.  On a conference call with analysts conducted the same day, Defendant Adam Elsesser, the Company's CEO was asked about the Jet 7 Xtra Flex MAX, a delivery device that utilizes the Jet 7 Xtra Flex catheter, and responded that Penumbra was "doing some of the work we do with every new product that is cleared to evaluate and make sure it's all good" and boasted that the device "is exactly what we hoped it would be."

7.     Throughout the Class Period, Defendants continued to make false and/or misleading statements and/or failed to disclose material adverse facts about the Jet 7 Xtra Flex's safety, as

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

well as the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Jet 7 Xtra Flex had known design defects that made it unsafe for its normal use; (2) that Penumbra did not adequately address the risk of the Jet 7 Xtra Flex causing serious injury and deaths, which had in fact already occurred; (3) that the Jet 7 Xtra Flex was likely to be recalled due to its safety issues; and (4) as a result, Penumbra's public statements as set forth above were materially false and misleading at all relevant times.

8.     On September 14, 2020, the Foundation for Financial Journalism (the "FFJ"), an independent non-profit news outlet, published an article raising serious questions about the Jet 7 Xtra Flex's safety profile. The FFJ noted that since being introduced in mid-2019, there were twelve deaths listed in an FDA database that occurred after a surgeon injected an iodine contrast dye into the Jet 7 Xtra Flex. The FFJ article described how Penumbra's warnings against using the product with contrast dye and non-Penumbra products did little to address the Jet 7 Xtra Flex's safety issues. In response, Penumbra's stock price fell by nearly 3%, from $199.43 per share on September 13, 2020 to $193.66 per share on September 14, 2020, a decline of $5.77 per share.

9.     On November 9, 2020, the securities research firm Quintessential Capital Management ("QCM") released a presentation concerning Penumbra and the safety of the Jet 7 Xtra Flex. Titled "Penumbra and Its Killer Catheter," QCM's report detailed injuries and deaths resulting from product malfunctions, and highlighted that Penumbra did not issue any notice to U.S. healthcare providers concerning the device's safety issues until more than a month after the Company's Japanese distributor sent out its warning, and more than nine months after the first patient died from the product's malfunction. QCM accused Penumbra of a "seemingly blatant disregard for patients' lives" and essentially "blaming doctors" for the devices' design defects. The Company, however, continued to insist that the Jet 7 Xtra Flex was "absolutely safe" and reassured investors that any claims to the contrary made "no sense" and there "isn't an issue."

10.     On November 23, 2020, an article was published in the Journal of NeuroInterventional Surgery presenting the cases of three patients who suffered as a result of Jet 7 Xtra Flex device malfunctions, including two fatalities.  Although the journal article was not widely publicized on November 23 aside from a Twitter post just before market close from an account with a small following, over the next two days the article was more widely disseminated, particularly after it was shared by multiple reputed short sellers with hundreds of thousands of followers, including Marc Cohodes and Muddy Waters.  As this report became more widely circulated, it caused Penumbra stock to fall from $254.71 on November 23, 2020 to $224.12 on November 25, 2020, a decline of about 12%.

11.     On December 8, 2020, before the market opened, QCM issued another report reiterating its prior assertions and disclosing additional facts about the Jet 7 Xtra Flex's safety issues.  Among other things, QCM's second report questioned the validity and independence of the scientific research supporting the Jet 7 Xtra Flex's safety, and accused the Company of using a fake author to publish studies regarding the purported safety and efficacy of its products.  In response, Penumbra's stock price fell by 9%, from $224.02 per share on December 7, 2020 to $204.07 per share on December 8, 2020, a decline of $19.95 per share.

12.     Finally, on December 15, 2020, after the market closed, the Company issued a press release announcing that it was issuing an "urgent" recall of the Jet 7 Xtra Flex because the catheter "may become susceptible to distal tip damage during use" which could lead to injury or death.  On a conference call held the same day, the Company's CEO acknowledged that the product's design "ma[de] the catheter susceptible to failure in certain scenarios" and that the Company's "steps to ensure the safe use of the product . . . were not able to fully address the risks."  In response, Penumbra's stock price fell by 7%, from $188.82 per share on December 15, 2020 to $174.98 per share on December 16, 2020, a decline of $13.84 per share.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
4

13.     As a result of Defendants' wrongful acts and omissions and the decline in the Company's share price, Plaintiff and other Class members have suffered significant damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 27 of the Exchange Act (15 U.S.C. §78aa).

16.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b), Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District, as Penumbra is headquartered in this District.

17.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Penumbra common stock between August 3, 2020 and December 15, 2020, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

19.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Penumbra's common shares actively traded on the New York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of shares of Penumbra common stock were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Penumbra or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

21.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

22.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)   whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b)   whether Defendants participated in and pursued the common course of conduct complained of herein;

c)   whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of Penumbra;

d)      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance, and prospects of Penumbra;

e)      whether the market price of Penumbra common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)      the extent to which the members of the Class have sustained damages and the proper measure of damages.

23.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## PARTIES

24.     Plaintiff Charles Williams, as set forth in the accompanying certification, incorporated by reference herein, purchased Penumbra common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

25.     Defendant Penumbra is incorporated under the laws of Delaware with its principal executive offices located in Alameda, California.  Penumbra's common stock trades on the NYSE exchange under the symbol "PEN."

26.     Defendant Adam Elsesser ("Elsesser") has served at all relevant times as the Company's Chief Executive Officer ("CEO") and a member of its Board of Directors.

27.     Defendant Gita Barry ("Barry") has served at all relevant times as the Company's Executive Vice President, Global Marketing & Public Relations.  Barry frequently serves as the Company's spokesperson, issuing statements on behalf of the Company.

28.     Defendants Elsesser and Barry (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

29.     The Company and the Individual Defendants are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

30.     Penumbra is a global healthcare company that develops, manufactures and sells innovative medical devices for patients suffering from stroke and other vascular and neurovascular diseases.  Penumbra was the first company to market aspiration catheters, a specialized catheter designed to remove blood clots from arteries and veins in stroke patients, in a surgical procedure known as a thrombectomy.

31.     Since their introduction in 2014, Penumbra's aspiration catheters were rapidly adopted by healthcare providers and quickly became ubiquitous in operating rooms across the nation.  This widespread adoption helped propel the Company's stock price from roughly $40 per

share following the Company's initial public offering on September 18, 2015, to over $200 per share by the start of the Class Period in July 2020.

32.     Until recently, one of the Company's flagship products was the "Jet 7 Xtra Flex," an aspiration catheter designed to be inserted into an affected artery, navigated to a blood clot, and used to suck the clot out of the patient's body.  The Jet 7 Xtra Flex was introduced to the U.S. market in July 2019 as a supposed improved version of the Company's groundbreaking Jet 7 catheter, adding new technology that made the device far more flexible than the Company's prior aspiration catheters and those of its rivals.  In announcing this innovative new line of catheters, the Company touted the Jet 7 Xtra Flex as offering "the highest thrombus removal force for revascularization of acute ischemic stroke patients with large vessel occlusions" of any available product.

33.     The Jet 7 Xtra Flex quickly became a star performer and key driver of the Company's revenue growth.  Following its launch, Penumbra executives hailed the Jet 7 Xtra Flex's widespread adoption.  For example, in November 2019, Defendant Elsesser told investors regarding the Jet 7 Xtra Flex that "physicians have been extremely favorable about its navigation, ease-of-use and the increase speed of the overall stroke procedure" which was "driv[ing] growth in our neuro business."  Elsesser also stated that since the launch of the Jet 7 Xtra Flex, the Company "started to see signs that our team is beginning to take back share from those customers that we might have lost."  The following month, the Company identified the new Jet 7 Xtra Flex in an investor presentation as a "near term growth driver."

34.     In mid-2020, concerns about the Jet 7 Xtra Flex's safety began to emerge.  On June 22, 2020, for example, Penumbra's distributor in Japan sent a letter to hospitals warning of issues with the new Jet 7 Xtra Flex, stating that "part of the catheter inflated into a balloon and damaged

a patient's blood vessel" when the product was used.  Shortly thereafter, the Company suspended sales in Japan.

35.    On July 27, 2020, Penumbra issued its Notification to physicians and other healthcare providers acknowledging reported instances in which the distal tip of the catheter broke or expanded, carrying a risk of injury or death, and warning physicians to exercise caution with the Company's Jet 7 Xtra Flex.  In particular, the Notification warned against the practice of injecting contrast dye through the Jet 7 Xtra Flex to monitor blood flow, as well as using the Jet 7 Xtra Flex in conjunction with non-Penumbra products.  The Notification stated that:

> Penumbra has received reports of Penumbra JET 7 Reperfusion Catheter with Xtra Flex technology (JET 7 Xtra Flex) distal tip expansion or rupture when used during injection of contrast media.  JET 7 Xtra Flex may become susceptible to expansion or rupture during contrast injection due to distal tip weakening from manipulation against resistance or use with other manufacturers' revascularization devices. Distal tip expansion or rupture may cause vessel damage and subsequent patient injury or death.

36.    The Notification warned against (1) "[p]erforming contrast injections through JET 7 Xtra Flex" because such use was purportedly "not consistent with the intended use of the product"; and (2) using the device with certain non-Penumbra products because the Jet 7 Xtra Flex "has not been tested for compatibility with other manufacturer's revascularization devices."  The Notification further informed healthcare providers that Penumbra would issue a labeling update reflecting these warnings and that the Company was "committed to product safety and performance" and "continuing to monitor and investigate these adverse event reports."  These issues continued into the Class Period as the Company assured investors and practitioners alike of Jet 7 Xtra Flex's safety.

**Materially False and Misleading Statements**
**Issued During the Class Period**

37.    The Class Period begins on August 3, 2020, when the Company announced its financial results for the second quarter of 2020.  On a conference call with analysts conducted the

same day, Elsesser was asked about the Jet 7 Xtra Flex MAX, a delivery device that utilizes the Jet 7 Xtra Flex catheter, and responded that Penumbra was "doing some of the work we do with every new product that is cleared to evaluate and make sure it's all good" and stated that the device "is exactly what we hoped it would be."

38.     On August 27, 2020, Capitol Forum, an investment research firm, published a report on Penumbra and the safety profile of the Jet 7 Xtra Flex based on interviews with doctors and an analysis of adverse incident reports contained in the FDA's Manufacturer and User Facility Device Experience ("MAUDE") database.  Titled "Penumbra: Jet 7 Catheter Susceptible to Malfunction, Risking Injury or Patient," the Capitol Forum report described how the Jet 7 Xtra Flex's failures that caused injuries and death stemmed from doctors injecting contrast dye inside the catheter to monitor blood flow.  The report further described that the MAUDE database logged 13 deaths involving a Jet 7 device following the introduction of the Jet 7 Xtra Flex, as opposed to two deaths prior to that.

39.     The Capitol Forum report included statements from the Company and Defendant Barry, a primary spokesperson for the Company concerning Jet 7 Xtra Flex-related issues, responding to Capitol Forum's findings.  First, Defendant Barry asserted that the catheter's labeling "has always stated contrast injections should be made through a different catheter used to access the brain arteries, called a guide catheter."  Second, regarding the MAUDE reports, the Company asserted that it "actively discussed the reported adverse events and deaths with the FDA and published a voluntary Notification to Healthcare Providers with FDA's support to notify physicians of labeling changes, intended to further remind physicians about the use of the catheter and contrast injection."  The Company further assured investors that it "continues to see strong demand for the Penumbra JET 7 Reperfusion Catheter with Xtra Flex technology and is not aware of any new reports of events that were the subject of the Notification."

40.     On September 4, 2020, Capitol Forum published another report about the Jet 7 Xtra Flex in which Defendant Barry further assured investors that "Penumbra comprehensively files medical device reports with the FDA for all adverse events associated with its products, as reflected in the MAUDE database and in accordance with medical device reporting regulations applicable to medical device manufacturers . . . .  Penumbra evaluates the medical device reports and takes all necessary and appropriate actions depending on the nature of the issue."

41.     On September 9, 2020, at the Wells Fargo Securities 2020 Virtual Healthcare Conference, Defendant Elsesser again assured investors that the Jet 7 Xtra Flex was safe, minimized product failures as limited to "a rare number of cases," and reiterated that the Company was taking all necessary actions in response to the deaths.  Specifically, Elsesser stated that:

> What we learned after tens of thousands of cases that, in some cases – again, not that any case you never want your product to ever not perform, and I don't want to diminish this, it's – we would love to have them be perfect. ***When – in a rare number of cases when the catheter has injection of contrast put through it, the tip expands a little, and that expansion has hurt and caused the death of some patients.*** As soon as we did our evaluation and went through all of the work that is sort of part of running a medical device company through your design control and quality system, ***we made the determination that rather than rely on the IFU that existed that said do not do a contrast injection through the catheter, we wanted to make that even more strong, more aware so that physicians would be notified. And if they didn't know what the IFU said, they would now know***.
>
> So we worked with the FDA. We submitted a change to our IFU and had that cleared. They, of course, reviewed all of the data and all the incidents and everything to agree. ***And we submitted that or sent that notification out to everyone who had purchased it through their – through the formal channels as well as giving it to the society so that there would be no possibility that people wouldn't know about this***. It seemed like the right thing to do. It's, without a doubt, being proactive in making sure people know about it.
>
> ***Now we certainly understand that some doctors need to or make the decision using their really great clinical judgment, that in certain cases, they may want to inject contrast. And then we just wanted to make sure that in those cases, they would not do it through our catheter, that they would use a different catheter, whether it's a catheter that we sell or somebody else's.*** And they get to make that choice. That's what a doctor does, and they have great judgment. So that's sort of the fact pattern. (emphasis added).

42.     Additionally, in response to analyst concerns about the medical and market viability of the Jet 7 Xtra Flex, Elsesser staunchly denied "any possibility" of its recall, touted the success of the Company's July 2020 Notification, and assured investors that the Company's financial performance was not in question.  Specifically, Elsesser stated that:

> Look, I don't know where the conversation around recall started. That's, I think, a competitive aspect. Again, I dare say that the company that just did a similar thing with their high-profile products, not planning on recalling that, the real recall is a different animal. ***This is not a product that has any possibility of needing to be recalled.*** If you – again, since our notification, this is really important, we have not had another incident that we're aware of in which somebody did this and they had an issue. So it worked, and that was sort of the point of doing it and getting that warning out there. ***So I think you're 100% accurate that recall is not something that seems – I've never heard that word being discussed again other than sort of in the shadows by competitors.***

> * * *

> ***So I have a lot of confidence that we're not going to see share loss, and we don't have to start measuring it by share loss. And I would actually be bold enough to say it's not impossible when this is all done in the long run, maybe not in the short term, but in the long run, we might not see share gain from this. It's – it sort of reeks a little of sort of desperation.***  (emphasis added).

43.     The above statements identified in ¶¶37-42 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the Jet 7 Xtra Flex had known design defects that made it unsafe for its normal use; (2) that Penumbra did not adequately address the risk of Jet 7 Xtra Flex causing serious injury and deaths, which had in fact already occurred; (3) that the Jet 7 Xtra Flex was likely to be recalled due to its safety issues; and (4) as a result, Penumbra's public statements as set forth above were materially false and misleading at all relevant times.

**The Truth Gradually Emerges**
**While Defendants Continue To Mislead Investors**

44.     On September 14, 2020, the FFJ published an article raising serious questions about the Jet 7 Xtra Flex's safety profile.  The article noted that since being introduced in mid-2019, there were twelve deaths listed in MAUDE that occurred after a surgeon injected an iodine contrast dye into the Jet 7 Xtra Flex. Like Capitol Forum, the FFJ underscored that Penumbra's warnings against using the product with contrast dye and non-Penumbra products did little to address the Jet 7 Xtra Flex's safety issues.

45.     In reaction to the news, Penumbra's stock price fell by nearly 3%, from $199.43 per share on September 13, 2020 to $193.66 per share on September 14, 2020, a decline of $5.77 per share.

46.     On September 17, 2020, at the Morgan Stanley Healthcare Conference, an analyst highlighted the Company's approach to the Jet 7 Xtra Flex safety issues of "sharing the risk with clinicians" and questioned whether the product was safe.  Elsesser responded unequivocally, stating that "Yes. There's – first of all, the answer is this product is absolutely safe. I mean there would be a massive uproar from physicians if somehow there's noise and sort of stuff pulled this – got people to say this product should go. I mean there would – that would just be absurd. I mean this product has enabled so many successful cases, that would not – I just think that's – that makes no sense to hear that. That isn't an issue."  In addition to dismissing any safety issues with the Jet 7 Xtra Flex, Elsesser essentially blamed doctors for the practice of injecting contrast through the catheter, stating, "I think a lot of folks who may have done that, this whole scenario gave them an opportunity to rethink it and go, why was I doing that?  Maybe I should limit that."

47.     On October 28, 2020, the Company announced its financial results for the third quarter of 2020.  On a conference call with analysts conducted the same day, Elsesser reiterated

the Jet 7 Xtra Flex's safety, the success of the July 2020 Notification in ensuring its safe use, and

the commercial success of the product, stating in relevant part:

> Before getting to our neuro pipeline, let me talk about JET 7 XTRA FLEX. We have fielded a great number of questions from the investment community over the past few months regarding this product and the notification letter we sent to physicians at the end of July.
>
> ***First, it is important to state the JET 7 XTRA FLEX is the most advanced trackable reperfusion catheter we have ever launched. And its strong contribution to our Q3 results, which I'll touch on in a moment, supports this statement. Second, we are proud of our physician customers, working together with the Penumbra team, to take the time to refamiliarize and put into practice the important instructions on how to use JET 7 XTRA FLEX to safely and successfully treat their stroke patients.***
>
> Given the questions this quarter, we think it's important to share more detail on 2 fronts. ***First, JET 7 XTRA FLEX revenue in the U.S. in the third quarter was within $400,000 of the product's highest sales quarter ever. Secondly and more importantly, we are not aware of any new reports, either as reported to the company or the MAUDE database, that were the subject of the notification and were related to events that occurred after the date of their notification***. It is important to remember, competition in the neurovascular space has always been and will likely continue to be significant and aggressive. (emphasis added).

48.     On November 9, 2020, the securities research firm QCM released a report detailing

its investigation into the Company and the Jet 7 Xtra Flex's safety.  Titled "Penumbra and Its Killer

Catheter," the QCM accused Penumbra of a "seemingly blatant disregard for patients' lives" and

essentially "blaming doctors" for the devices' design defects. The QCM report highlighted that

Penumbra did not issue any notice to U.S. healthcare providers until more than a month after its

Japanese distributor sent out its warning in Japan, and more than nine months after the first patient

died from the product's malfunction.

49.     On November 23, 2020, an article was published in the Journal of

NeuroInterventional Surgery presenting the cases of three patients who suffered as a result of Jet

7 Xtra Flex device malfunctions, including two fatalities.  Although the journal article was not

widely publicized on November 23 aside from a Twitter post just before market close from an

---

account with a small following, over the next two days the article was more widely disseminated, particularly after it was shared by multiple reputed short sellers with hundreds of thousands of followers, including Marc Cohodes and Muddy Waters.  As this report became more widely circulated, it caused Penumbra stock to fall from $254.71 on November 23, 2020 to $224.12 on November 25, 2020, a decline of about 12%.

50.     On December 8, 2020, before the market opened, the Company held a conference call to discuss the status of the Jet 7 Xtra Flex.  In response to an analyst request for an update on the product's availability outside of the United States, Elsesser stated that in Japan and Europe, the product was still not available pending regulatory approval of the same changes in its safety instructions that the Company had to submit to the FDA.  However, Elsesser assured investors that once the Company received such regulatory approval, the product would be available in those markets.

51.     Also before market open on December 8, 2020, QCM issued another research report on Penumbra and the Jet 7 Xtra Flex. This second report reiterated QCM's findings regarding the Jet 7 Xtra Flex's safety, accused the Company of using a fake author for publishing studies that were foundational to the adoption of its products, and questioned the validity and independence of the Company's prior scientific research, including as to the Jet 7 Xtra Flex specifically.  Later that day, QCM's managing partner and chief investment officer appeared on CNBC's "Halftime Report" and said that the Jet 7 Xtra Flex was still not available in Japan "to this day," and cited nonpublic sources stating that the device was also not on sale in the EU "because of the accidents." These disclosures contrasted with the Company's prior representations that the Jet 7 Xtra Flex's availability in the EU and Japanese markets was only a matter of obtaining regulatory approval for the Company's new instructions.

52.     In reaction to the news, Penumbra's stock price fell by 9%, from $224.02 per share on December 7, 2020 to $204.07 per share on December 8, 2020, a decline of $19.95 per share.

53.     In response to QCM's research reports, Penumbra issued a press release on December 8, 2020 stating that it "stands by the record of the product" and that "Penumbra continues to follow all applicable Quality System Regulations and international standards that govern the design and quality of its products."   The release added that "Penumbra has helped thousands of sick patients and is unaware of a single patient death associated with the use of JET 7 Xtra Flex when it is used in line with the instructions for use and the notice Penumbra has provided to physicians."

54.     Finally, on December 15, 2020, after the market closed, the Company stunned investors by announcing that it was issuing an "urgent" and "voluntarily" recall of the Jet 7 Xtra Flex at the behest of the FDA.  According to the Company's press release, the recall was necessary "because the catheter may become susceptible to distal tip damage during use" which in conjunction with pressurization or contrast injection "may result in potential vessel damage, and subsequent patient injury or death."  Later that same day, the Company held a conference call with investors to discuss the recall.   During the call, Defendant Elsesser admitted that while the Jet 7 Xtra Flex's "trackability" enabled physicians to treat more patients, "the design considerations necessary to achieve that trackability also make the catheter susceptible to failure in certain scenarios."  Elsesser conceded that the July 2020 Notification and "other steps to ensure the safe use of the product . . . were not able to fully address the risks."  Also on December 15, 2020, Penumbra filed with the SEC a Regulation FD Disclosure stating that as a result of the recall of the Jet 7 Xtra Flex, "the Company expects to record associated costs in the fourth quarter ending December 31, 2020, primarily as a one-time reduction to revenue of less than $20 million to account for product returns."

55.     In reaction to the news, Penumbra's stock price fell by 7%, from $188.82 per share on December 15, 2020 to $174.98 per share on December 16, 2020, a decline of $13.84 per share.

### UNDISCLOSED ADVERSE FACTS

56.     The market for Penumbra's common stock was open, well-developed, and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Penumbra's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Penumbra's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Penumbra and have been damaged thereby.

57.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Penumbra's common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Penumbra's business, operations, and prospects as alleged herein.

58.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Penumbra's financial well-being and prospects.

59.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements made during the Class

Period resulted in Plaintiff and the other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

60.    During the Class Period, as detailed herein, the Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Penumbra common stock and operated as a fraud or deceit on Class Period purchasers of Penumbra common stock.  Defendants failed to disclose to investors that the Company's public statements concerning the Jet 7 Xtra Flex were materially misleading and misrepresented material information.  When the Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Penumbra common stock fell precipitously as the prior inflation came out of the Company's stock price.  As a result of their purchases of Penumbra common stock during the Class Period, Plaintiff and the other Class members suffered economic loss.

61.    By failing to disclose the true state of the Company's business operations and financial prospects, investors were not aware of the true state of the Company's business operations and financial prospects.  Instead of truthfully disclosing during the Class Period the true state of the Company's business, including with regard to the Jet 7 Xtra Flex, Defendants concealed the truth from investors and presented a misleading picture of Penumbra's business operations and financial prospects.

62.    Defendants' false and misleading statements had the intended effect and caused Penumbra's common stock to trade at artificially inflated levels throughout the Class Period.  The stock price drops discussed herein caused real economic loss to investors who purchased the Company's common stock during the Class Period.

63.    The decline in the price of Penumbra's common stock after the truth emerged was a direct result of the nature and extent of the Defendants' fraud being revealed to investors and the

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

19

market.  The timing and magnitude of Penumbra's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the other Class members was a direct result of the Defendants' fraudulent scheme to artificially inflate the prices of Penumbra's common stock and the subsequent decline in the value of Penumbra's common stock when the Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## SCIENTER ALLEGATIONS

64.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

65.    As alleged herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Penumbra, their control over, and/or receipt and/or modification of Penumbra's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Penumbra, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

66.    At all relevant times, the market for Penumbra's common stock was an efficient market for the following reasons, among others:

        a)    Penumbra shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b)   As a regulated issuer, Penumbra filed periodic public reports with the SEC and/or the NYSE;

c)   Penumbra regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d)   Penumbra was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

67.   As a result of the foregoing, the market for Penumbra's common stock promptly digested current information regarding Penumbra from all publicly available sources and reflected such information in Penumbra's share price.   Under these circumstances, all purchasers of Penumbra's common stock during the Class Period suffered similar injury through their purchase of Penumbra's common stock at artificially inflated prices and a presumption of reliance applies.

68.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in substantial part, grounded on Defendants' material omissions.

## NO SAFE HARBOR

69.   The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.   The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

70.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Penumbra who knew that the statement was false when made.

## COUNT I

**Violation of Section 10(b) of The Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

71.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

72.     During the Class Period, Penumbra and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Penumbra common stock; and (iii) cause Plaintiff and the other members of the Class to purchase Penumbra common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

73.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Penumbra common stock in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  The Defendants are sued as primary

participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Penumbra, as alleged herein.

74.     Penumbra and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Penumbra as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Penumbra's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about Penumbra and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Penumbra's common stock during the Class Period.

75.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other, and were advised of and had access to other members of the Company's management team, internal reports, and other data and information

about the Company's business operations and financial performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

76.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing Penumbra's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

77.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Penumbra common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Penumbra shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Penumbra common stock during the Class Period at artificially inflated high prices and were damaged thereby.

78.     At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Penumbra, which were not disclosed by the Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired Penumbra common stock during the Class Period, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

79.     By virtue of the foregoing, Penumbra and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

80.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

81.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

82.     The Individual Defendants were and acted as controlling persons of Penumbra within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual

Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

83.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

84.     As set forth above, Penumbra and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

1

**JURY TRIAL DEMANDED**

2

Plaintiff hereby demands a trial by jury.

3

Dated: January 15, 2021                                    Respectfully Submitted,

4

                                                           */s/ David R. Kaplan*

5                                                          David R. Kaplan

6                                                          **SAXENA WHITE P.A.**

7                                                          David R. Kaplan (SBN 230144)
                                                           12750 High Bluff Drive

8                                                          Suite 475
                                                           San Diego, CA 92130

9                                                          Telephone: (858) 997-0860
                                                           Facsimile: (858) 369-0096

10                                                         dkaplan@saxenawhite.com

11                                                         Richard A. Maniskas, Esquire

12                                                         RM Law, P.C.
                                                           1055 Westlakes Dr., Ste. 300

13                                                         Berwyn, PA 19312
                                                           Telephone: 484-324-6800

14                                                         Facsimile: 484-631-1305
                                                           rmaniskas@rmclasslaw.com

15

16                                                         *Counsel for Plaintiff*

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATION OF PLAINTIFF

I, Charles Williams ("Plaintiff"), hereby declare as to the claims asserted under the federal securities laws that:

1.      Plaintiff has reviewed the complaint and authorizes its filing.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, and I will testify at deposition or trial, if necessary.  I understand that this is not a claim form and that I do not need to execute this Certification to share in any recovery as a member of the class.

4.      Plaintiff's purchase and sale transactions in the **Penumbra, Inc. (NYSE: PEN)** security that is the subject of this action during the class period is/are as follows:

<table>
<tr><td colspan="3">PURCHASES</td><td colspan="3">SALES</td></tr>
<tr><td>**Buy Date**</td><td>**Shares**</td><td>**Price per Share**</td><td>**Sell Date**</td><td>**Shares**</td><td>**Price per Share**</td></tr>
<tr><td>10/29/20</td><td>20</td><td>262.74</td><td></td><td></td><td></td></tr>
<tr><td></td><td></td><td></td><td></td><td></td><td></td></tr>
<tr><td></td><td></td><td></td><td></td><td></td><td></td></tr>
<tr><td></td><td></td><td></td><td></td><td></td><td></td></tr>
</table>

***Please list additional transactions on separate sheet of paper, if necessary.***

5.      Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.      During the three years prior to the date of this Certification, Plaintiff has not moved to serve as a representative party for a class in an action filed under the federal securities laws.

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __8th__day of January, 2021.

*Charles Williams*

Charles Williams (Jan 8, 2021 13:36 EST)

Charles Williams